UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KARIDIS TUBO,

                              Plaintiff,                     No. 13-cv-1495 (NSR)

              -against-                                      OPINION & ORDER

ORANGE REGIONAL MEDICAL CENTER,

                              Defendant.

NELSON S. ROMÁN, United States District Judge

       Plaintiff Karidis Tubo asserts claims against her former employer, Orange Regional

Medical Center ("ORMC" or "Defendant"), arising out of the termination of her employment on

September 23, 2011. Plaintiff alleges that Defendant discriminated against her on the basis of

her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law,

N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"). Plaintiff further alleges that Defendant retaliated

against her in violation of Title VII, Section 1981, and the NYSHRL. Finally, Plaintiff asserts a

breach of contract/New York Labor Law ("NYLL") claim premised upon Defendant's alleged

failure to pay her earned vacation time.

       Before the Court is Defendant's motion for summary judgment. For the following

reasons, Defendant's motion is GRANTED.

## BACKGROUND

       Plaintiff denies the veracity of a substantial number of statements in Defendant's Local

Civil Rule 56.1 Statement of Material Facts Not in Dispute on Defendant's Motion for Summary

Judgment ("Defendant's 56.1 Statement"); however, Plaintiff repeatedly fails to support those

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/13/2015

denials with citations to admissible evidence. "To oppose a motion for summary judgment, plaintiff is required by the Court's Local Rules to submit a Statement of Material Facts upon which [she] contends there 'exists a genuine issue to be tried' and as to 'each statement controverting any statement of material fact . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).'" *Tuccio v. FJC Sec. Servs., Inc.*, No. 12-cv-5506 (JFB) (GRB), 2014 WL 4438084, at *5 (E.D.N.Y. Aug. 18, 2014) (citing L. Civ. R. 56(d)) *report and recommendation adopted*, No. 12-cv-5506 (JFB) (GRB), 2014 WL 4438469 (E.D.N.Y. Sept. 8, 2014). "Merely denying certain statements in the moving party's statement of undisputed material facts without stating the factual basis for such denial and without disclosing where in the record is the evidence relied upon in making such denial does not constitute a 'separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried'—as is required to controvert the moving party's statement of undisputed material facts . . . ." *Covelli v. Nat'l Fuel Gas Distrib. Corp.,* No. 99-cv-0500, 2001 WL 1823584, at *1 (W.D.N.Y. Dec. 6, 2001) (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001)) *aff'd Covelli v. Nat'l Gas Distrib. Corp.,* 49 Fed. App'x 356 (2d Cir. 2002). To the extent Plaintiff's Response to Defendant's Local Rule 56.1 Statement of Material Facts ("Plaintiff's 56.1 Statement") "fail[s] to cite to admissible evidence or couch[es] argument and analysis as fact," the Court will not consider those statements to be material facts. *Forbes v. Lighthouse Int'l*, No. 11-cv-7065 (VB), 2013 WL 1811960, at *1, n. 1 (S.D.N.Y. May 1, 2013).[1]

In 2002, two hospitals—Arden Hill Hospital ("Arden") and Horton Medical Center ("Horton")—merged to form ORMC. (Def.'s 56.1 ¶ 1.) By 2009, a plan was developed for the

---

[1] The following paragraphs in Plaintiff's 56.1 Statement are unsupported by evidence in the record and/or contain improper arguments or conclusory allegations: 24, 25, 31–34, 43, 56, 64, 65, 71, 72, 75, 84, 90, 94, and 106.

Arden and Horton facilities to be consolidated into a new facility by August 2011.  (*Id*. ¶ 2.)
Plaintiff, an Afro-American woman, was hired by Defendant on or about June 29, 2009 as
Administrator, Maternal/Child Health.  (*Id*. ¶ 3.)  Plaintiff had combined responsibility for both
the Arden and Horton Labor & Delivery Departments, which were both operated out of the
Horton facility.  (*Id*. ¶ 5.)

ORMC's Chief Nursing Officer, Kathleen Guido, was Plaintiff's direct supervisor until
Ms. Guido's departure in or about December 2010.  (*Id*. ¶ 6.)  At the time Plaintiff was hired,
JoAnn Schultz was the Administrator of the Arden and Horton Operating Rooms.  (*Id*. ¶ 7.)
Plaintiff and Ms. Schultz were peers and both reported to Ms. Guido.  (*Id*. ¶ 8.)  At all relevant
times, the Chief Nursing Officer reported directly to ORMC's Chief Executive Officer Scott
Batulis.  (*Id*. ¶ 9.)  Catherine Fogarty, a Caucasian woman, was hired by Defendant as Nurse
Director of Emergency Room Services at Horton on June 29, 2009.  (*Id*. ¶¶ 13–14.)  Ms. Guido
was Ms. Fogarty's direct supervisor and conducted her 2010 performance review.  (*Id*. ¶ 15.)
Subsequent to Ms. Guido's departure from ORMC, Ms. Schultz was promoted to the position of
Interim Chief Nursing Officer.  (*Id*. ¶ 16.)  Both Plaintiff and Ms. Fogarty directly reported to
Ms. Schultz from December 2010 until the termination of their respective employments with
ORMC.  (*Id*. ¶¶ 17, 19.)

When Plaintiff was hired in June 2009, she received a copy of ORMC's Employee
Manual containing ORMC's EEO policy prohibiting discrimination on the basis of race and
retaliation for engaging in protected activity.  (*Id*. ¶ 20; Affidavit of Mary A. Smith, Esq. in
Support of Defendant Orange Regional Medical Center's Motion for Summary Judgment
("Smith Aff."), Ex. D.)  The Employee Manual also contained a copy of ORMC's Vacation
Policy (Def.'s 56.1 ¶ 21), which states that "[a]n employee terminated for reasons other than

economic layoff, retrenchment or a departmental reorganization or an employee who resigns without proper working notice <u>automatically forfeits</u> any accrued benefits."  (Def.'s 56.1 ¶ 22; Affidavit of Janet Connery in Support of Defendant Orange Regional Medical Center's Motion for Summary Judgment ("Connery Aff."), Ex. 3 (emphasis in original).)  Plaintiff received copies of ORMC's updated employment policies throughout her tenure at ORMC.  (Def.'s 56.1 ¶ 23.)

## I.     Plaintiff's Responsibilities as Labor & Delivery Administrator

At the time of Plaintiff's hire in June 2009, ORMC's Labor & Delivery Department had consistently low patient satisfaction scores, dissatisfied medical staff, over-staffing, and cross-training issues.  (Def.'s 56.1 ¶¶ 24–25.)  Plaintiff was aware of these issues when she was hired and understood that part of her responsibility was to improve deficiencies in the Labor & Delivery Department.  (*Id*. ¶¶ 26–27.)  On occasion, Plaintiff discussed her department's low patient satisfaction ratings with Ms. Guido, CEO Batulis, and Ms. Schultz.  (*Id*. ¶ 32.)  Plaintiff also frequently met with Ms. Guido to discuss the Labor & Delivery Department's goals and issues.  (*Id*. ¶ 53.)

Plaintiff was responsible for cross-training nurses in the Labor & Delivery Department. (*Id*. ¶ 35.)  Cross-training the nurses would allow them to perform all functions in the Labor & Delivery Department and provide more flexibility with scheduling.  (*Id*. ¶¶ 35, 42.)  While the Arden nurses were cross-trained, the Horton nurses were not fully cross-trained.  (*Id*. ¶¶ 37–38.)  ORMC's goal was to have all Labor & Delivery nursing staff cross-trained by the time ORMC relocated to its new facility in August 2011.  (*Id*. ¶ 44.)

4

Plaintiff also was charged with developing nursing policies and procedures for the Labor & Delivery Department.  (*Id*. ¶ 47.)  Plaintiff met with Ms. Guido on a monthly basis to discuss the development of these policies and procedures.  (*Id*. ¶ 48.)

Finally, as a "Super User" of Epic—an electronic data system for medical record-keeping—Plaintiff was responsible for training nurses in the Labor & Delivery Department to ensure their competency with the Epic system.  (*Id*. ¶ 49.)  Though ORMC's switch to solely electronic medical record-keeping was scheduled to be completed by March 2011, the nurses in the Labor & Delivery Department were not sufficiently proficient in Epic to permit that transition in March 2011.  (*Id*. ¶¶ 50–51.)

## II.     ORMC's Review of Deficiencies in Plaintiff's Department

During a January/February 2011 meeting, Plaintiff met with Ms. Schultz, CEO Batulis, and a nurses' union representative to discuss the progress of the cross-training initiative.  (Def.'s 56.1 ¶ 55.)  At that meeting, Ms. Schultz and CEO Batulis expressed to Plaintiff that they felt the cross-training initiative was not progressing as it should.  (*Id*. ¶ 56.)  By the time of the August 2011 move, some nurses were fully cross-trained, while others were only substantially cross-trained.  (*Id*. ¶ 46.)

In a March 2011 meeting, Ms. Schultz spoke with Plaintiff about the behavior of nurses in the Labor & Delivery Department and the impact on patient satisfaction scores.  (*Id*. ¶ 64.)  Maternity wards typically have the highest patient satisfaction scores in hospitals; however, this was not the case with ORMC's Labor & Delivery Department.  (*Id*. ¶ 29.)  Ms. Schultz additionally discussed the mislabeling of blood by a nurse in Plaintiff's department.  (*Id*. ¶ 66.)  In the spring/summer of 2011, Ms. Schultz again met with Plaintiff to discuss low patient satisfaction scores in the Labor & Delivery Department.  (*Id*. ¶ 69.)  By September 2011, the

5

Labor & Delivery Department's patient satisfaction scores still had not risen to acceptable levels. (*Id.* ¶ 34.)  CEO Batulis also spoke with Plaintiff in the winter of 2011 regarding nurses' attitudes—particularly one nurse's rude manner.  (*Id.* ¶ 63.)

### III.    Alleged Protected Activity & Discriminatory Treatment

In or around January/February 2011, Plaintiff attended a leadership conference.  (Pl.'s 56.1 ¶ 73.)  During the conference, Plaintiff expressed to the group that she believed her department lacked sufficient resources to aid her in her job performance, and the speaker advised her to address that concern with her supervisor.  (*Id.* ¶¶ 73–74.)  Plaintiff did not explicitly state that she was not receiving resources due to her race.  (Def.'s 56.1 ¶ 117.)  In particular, it was Plaintiff's position that she needed a clinical coordinator to provide her with assistance in the Labor & Delivery Department.  (Pl.'s 56.1 ¶ 76.)  Plaintiff met with Ms. Schultz following the leadership conference to discuss adding a clinical coordinator to the Labor & Delivery Department.  (*Id.* ¶ 75.)  Though Plaintiff repeatedly requested the creation of a clinical coordinator position in her department, she was informed that her department was overstaffed and that cross-training nurses would alleviate budgetary issues and make it easier to create such a position.  (*Id.* ¶ 79.)  The Labor & Delivery Department did not have budgetary approval for a clinical coordinator until spring 2011.  (*Id.* ¶ 78.)

During a meeting in January/February 2011, Plaintiff told CEO Batulis that she required educational support and a clinical coordinator to assist her in performing her job.  (Pl.'s 56.1 ¶ 118.)  Plaintiff never stated in that meeting that she believed her race contributed to her level of clinical support.  (Def.'s 56.1 ¶ 119.)

In 2011, Plaintiff relayed to ORMC's Medical Director, Dr. Oxley, and the Director of Patient Quality Assurance, Susan O'Boyle, that she overheard the use of the word "negro" in an

operating room.  (Pl.'s 56.1 ¶ 121.)  Plaintiff did not recall any of the specifics of the incident,

including when it happened, the individuals involved, or the context of the remark.  (*Id*. ¶ 122.)

During her conversation with Dr. Oxley and Ms. O'Boyle, Plaintiff advised them that she felt she

was not provided adequate resources because of her race.  (*Id*. ¶ 121.)

Between December 2010 and her August 2011 termination, Plaintiff asked Ms. Schultz

on multiple occasions whether she should attend Director-level meetings conducted by Ms.

Schultz.  (Def.'s 56.1 ¶ 111.)  Ms. Schultz informed Plaintiff that she would meet with Plaintiff

separately, which made Plaintiff feel excluded.  (*Id*.)  Directors are a level below

administrators—Plaintiff's position—at ORMC.  (*Id*. ¶ 112.)  Plaintiff does not know whether

Ms. Schultz met with other Caucasian administrators individually; however, Plaintiff asserts that

the Caucasian administrators had support staff that attended the director meetings.  (Pl.'s 56.1 ¶

113.)

## IV.    **Plaintiff's 2011 Performance Evaluation & Termination**

Acting as Interim Chief Nursing Officer, Ms. Schultz prepared Plaintiff's 2011

performance review.[2]  (Def.'s 56.1 ¶ 83.)  Plaintiff's performance review indicated she received

a rating of "M-," though Plaintiff contends Ms. Schultz miscalculated and Plaintiff should have

received an "M".  (Pl.'s 56.1 ¶ 90.)  In any event, both "M-" and "M" are satisfactory grades.

(*Id*.)  Plaintiff's 2011 performance review indicated, among other things, that she was unable to:

- train all nurses on the Epic platform;
- "assure timely cross-training";
- "develop a collaborative working relationship with other departments"; and
- "improve patient satisfaction."

---

[2] The record reflects that Plaintiff was terminated from her position at ORMC on September 23, 2011.
(Def.'s 56.1 ¶ 101.)  The record is unclear as to why a performance review was given mid-year.

(Def.'s 56.1 ¶ 91; Declaration of Michael D. Diederich, Jr. ("Diederich Decl."), Ex. 2.)

Plaintiff contends that these criticisms were baseless, and subsequent to her termination from

ORMC, she submitted a letter to ORMC challenging the characterization of her job performance,

which she requested be appended to her 2011 performance evaluation.  (Pl.'s 56.1 ¶ 91;

Diederich Decl., Ex. 5.)  In her deposition, Ms. Schultz testified that the takeaway of Plaintiff's

2011 performance evaluation was that Plaintiff should be terminated.  (Def.'s 56.1 ¶ 92; Smith

Aff., Ex. A at 13:7–10.)   Though Ms. Schultz recommended to CEO Batulis that Plaintiff be

placed on a 3 month performance improvement plan ("PIP") (Def.'s 56.1 ¶ 92), CEO Batulis did

not recommend placing Plaintiff on a PIP.  (*Id*. ¶ 95.)  CEO Batulis reasoned that since Plaintiff

was in a high level position, she need not be placed on a performance plan.  (*Id*. ¶ 96; Smith Aff.,

Ex. E at 15:20–16:8.)  Plaintiff maintains that she should have been subject to progressive

discipline, in accordance with ORMC's Rules of Conduct and Corrective Action.  (Pl.'s 56.1 ¶

96; Diederich Decl., Ex. 6.)

On or about August 23, 2011, Plaintiff was notified that her employment with ORMC

was terminated.  (Pl.'s 56.1 ¶ 100.)  Ms. Schultz requested that Plaintiff remain for one month to

assist with the training and transition of an Interim Administrator in the Labor & Delivery

Department.  (Def.'s 56.1 ¶ 101.)  Plaintiff remained at ORMC for four weeks and was

terminated on September 23, 2011.  (*Id*. ¶ 102.)

### STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving

party bears the initial burden of pointing to evidence in the record, "including depositions,

documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).  The nonmoving party "may not

rely on conclusory allegations or unsubstantiated speculation."  *FDIC v. Great Am. Ins. Co.*, 607

F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted).  Moreover, "[a non-

moving party's] self-serving statement, without direct or circumstantial evidence to support the

charge, is insufficient to defeat a motion for summary judgment."  *Fincher v. Depository Trust &

Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008)

aff'd, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d

342, 353 (S.D.N.Y. 2003)).

Because discrimination cases often require the Court to conduct "an assessment of

individuals' motivations and state of mind," summary judgment should be used "sparing[ly]"

"because of juries' special advantages over judges in this area."  *Brown v. Henderson*, 257 F.3d

246, 251 (2d Cir. 2011) (citations and internal quotations omitted).  At the same time, "an

employment discrimination plaintiff faced with a properly supported summary judgment motion

must 'do more than simply show that there is some metaphysical doubt as to the material facts.'

She must come forth with evidence sufficient to allow a reasonable jury to find in her favor."  *Id.*

at 252 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## DISCUSSION

## I.  State and Federal Employment Discrimination Claims

Plaintiff's claims for race discrimination under Title VII or the NYSHRL are analyzed

under the *McDonnell-Douglas* burden-shifting framework.  *Vivenzio v. City of Syracuse*, 611

F.3d 98, 106 (2d Cir. 2010).  *See also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466

(2d Cir. 2001).  To establish a *prima facie* case of discrimination, a plaintiff must show that: (1)

she belongs to a protected class; (2) she was qualified for the position at issue; (3) she suffered

an adverse employment action; and (4) the adverse employment action occurred under

circumstances giving rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the plaintiff's termination. *Id.* If the defendant proffers a non-discriminatory reason for the termination, the presumption falls away, and summary judgment for the defendant is appropriate "unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (internal citations omitted). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered [nondiscriminatory] rationale is pretext, summary judgment dismissing the claim is appropriate." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) (internal citations and quotation marks omitted).

### A.    *Prima Facie Case*

Defendant does not dispute that Plaintiff has satisfied the first and third elements of the *McDonnell-Douglas* test. Nevertheless, Defendant contends that Plaintiff was not qualified for the position of Administrator of the Labor & Delivery Department as the record indisputably demonstrates that Plaintiff was not adequately performing her job duties (second element). Defendant further argues that there is no evidence in the record to support Plaintiff's claim that ORMC terminated Plaintiff due to her race (fourth element). (Def.'s Mot. at 14.)

### 1. Plaintiff's Qualifications

With respect to the second element of the *McDonnell-Douglas* test, Plaintiff advances several grounds to establish her qualifications for the job: (1) ORMC requested that Plaintiff remain on after her employment was terminated to train her replacement (Pl.'s 56.1 ¶ 102); (2) Plaintiff received an evaluation of "Exceeds Expectations" on her 2010 annual performance

review (Diederich Decl., Ex. 1); (3) Catherine Fogarty's (Nurse Director of Emergency Room Services) statements in her declaration that Plaintiff was a "very diligent and dedicated hospital manager" (Declaration of Catherine T. Fogarty ("Fogarty Decl.") ¶ 6);[3] and (4) even at the time of her termination Plaintiff received a satisfactory performance appraisal (Pl.'s 56.1 ¶ 90.)  (Pl.'s Opp. at 11–12.)

Plaintiff's burden of establishing her qualifications is a *de minimis* one, and she need not prove that she was the best person for the job.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) *as amended* (June 6, 2001) ("the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he possesses the basic skills necessary for performance of [the] job" (internal citations omitted)).  Under this standard, Plaintiff clearly has met her burden.  At the very least, Defendant's request that Plaintiff remain on at ORMC to train her successor creates a material question of fact as to Plaintiff's capabilities to perform her job.

### 2. Inference of Discrimination

While Plaintiff alleged facts sufficient to permit a jury to conclude that she was qualified for the position of Administrator, Maternal/Child Health, she has failed to meet her burden of demonstrating that her termination occurred under circumstances giving rise to an inference of discrimination.  Acknowledging that direct evidence of discrimination rarely exists, courts examine a variety of factors to evaluate whether there is "a permissible inference of

---

[3] Defendant contends that Ms. Fogarty's declaration "is rampant with unsupported and inadmissible hearsay conclusions and opinions about Plaintiff's job performance . . . ."  (Def.'s Reply at 2.)  "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  The Court agrees with Defendant that certain statements in Ms. Fogarty's declaration constitute inadmissible hearsay and will not consider such statements to be part of the evidentiary record.  *See* Section I.C *infra*.

discriminatory intent": (1) an employer's practice of interviewing replacements for plaintiff with qualifications substantially similar to plaintiff; (2) an employer's criticism of plaintiff "in ethnically degrading terms"; (3) an employer's "invidious comments" about other individual's in plaintiff's protected group; (4) an employer's favoritism towards other employees not in the protected group; and (5) the events leading up to and timing of plaintiff's discharge. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). However, a plaintiff's reliance "solely on conclusory allegations and unsupported inferences of discrimination" cannot support a *prima facie* case of discrimination. *Klier v. Snow*, No. 03-cv-4508 (HB), 2004 WL 1375259, at *3 (S.D.N.Y. June 17, 2004). To establish her *prima facie* case of discrimination, a plaintiff must do "more than cite to [her] alleged mistreatment and ask the court to conclude that it must have been related to [her] race." *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (internal quotation omitted).

Plaintiff points to the following as evidence supportive of an inference of discrimination in her termination from ORMC: (1) "special" treatment by Ms. Schultz (Declaration of Karidis Tubo Opposing Defendant's Motion for Summary Judgment ("Tubo Decl.") ¶¶ 20–22); (2) Plaintiff's replacement by three Caucasian women to perform her job (*id*. ¶ 86); (3) the use of the word "negro" by an unidentified ORMC employee (*id*. ¶ 110); and (4) the termination by ORMC of Shirlette Stewart, another African American employee (*id*. ¶ 95; Declaration of Shirlette Stewart ("Stewart Decl.").)

Regarding her "special" treatment, Plaintiff asserts that, as the only Afro-American in senior nursing leadership at ORMC, Plaintiff was excluded from nursing leadership meetings (Tubo Decl. ¶ 28), required to perform the job of three people (*id*. ¶ 21), denied requested support staff that other administrators and directors received (*id*.), not provided mentoring from

13

Ms. Schultz (*id*.), criticized for things outside of her control (*id*.), provided with conflicting job priorities (*id*.), not given any interim performance evaluations stating that she need to improve (*id*.), and fired notwithstanding a "satisfactory" performance evaluation (*id*).  Additionally, Plaintiff asserts that she was replaced by three Caucasian women to perform her job, which she alleges is demonstrative not only of racial bias but also that she was overworked in her role at ORMC.  (*Id*.)  Plaintiff relies solely upon her own assumption that each of these experiences was motivated by racial bias, which is insufficient to support an inference of discrimination. *McManamon v. City of New York Dep't of Corr.*, No. 07-cv-10575 (BSJ) (JCF), 2009 WL 2972633, at *5 (S.D.N.Y. Sept. 16, 2009) (collecting cases); *Sampson v. City of New York*, No. 07-cv-2836 (BSJ) (RLE), 2009 WL 3364218, at *4 (S.D.N.Y. Oct. 19, 2009) (same).  In any event, the record reflects that Plaintiff was not invited to director meetings because she was an administrator and that Plaintiff did not receive clinical support due to overstaffing issues in her department.  (Def.'s 56.1 ¶¶ 111–12, 79.)

Plaintiff further argues that the use of the word "negro" by an unidentified ORMC employee supports an inference of discrimination.  In her declaration, Plaintiff states that around February 2011, she told Medical Director, Dr. Oxley, and the Quality Assurance Administrator, Susan O'Boyle, that she overheard the derogatory remark in a conversation between nursing employees and other hospital staff.  (Tubo Decl. ¶ 110.)  Plaintiff could not identify the specific individuals who made the remark or were involved in the conversation, nor did she identify the timing of the remark.  While such a remark is generally suggestive of racial bias, there is no evidence of institutional racial bias or racial bias on the part of the decision makers at ORMC. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 743 (2d Cir. 2014) (holding that racially charged remarks did not "raise a triable issue of employment

discrimination" because the individual who made the remark was not plaintiff's supervisor, nor did he have control over plaintiff's employment); *Tomassi v. Insignia Fin. Grp.*, 478 F.3d 111, 115 (2d Cir. 2007) (finding that racist comments made by an individual other than a decision-maker "may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark"), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).

As a last-ditch effort to substantiate an inference of discrimination, Plaintiff points to the termination of another ORMC employee of African descent, Shirlette Stewart.  While a plaintiff may establish her *prima facie* case by "demonstrating the existence of a discriminatory pattern and practice," (*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 359 (1977) (quoting *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772)) "to prove such a pattern or practice, plaintiff[] must demonstrate more than isolated or accidental or sporadic discriminatory acts." *Melani v. Bd. Of Higher Educ. of New York*, 561 F. Supp. 769, 772–73 (S.D.N.Y. 1983). Consequently, Plaintiff falls short of meeting her burden by proffering evidence of Defendant's termination of only one other individual from the same protected group.[4]  Given the absence of direct evidence of discrimination and the "paucity of indirect evidence" following this Court's review of the papers and the evidentiary record, Plaintiff "has not established by a preponderance of the evidence that race was at least one of the motivating factors in [her] termination."  *Debidat v. Marriott Int'l, Inc.*, 580 F. Supp. 2d 300, 307 (S.D.N.Y. 2008).

---

[4] Relatedly, this Court is not persuaded by Defendant's argument that their termination of a Caucasian employee in a similar position as Plaintiff suggests the absence of racial bias.  (Def.'s Reply at 3.)  Just as a plaintiff cannot conclusively demonstrate discrimination by pointing to the termination of a single, other employee in the same protected group, a defendant cannot refute a claim of discrimination by pointing to its termination of a single employee outside of a plaintiff's protected group.

### B.      Legitimate, Nondiscriminatory Reasons for Termination

Even assuming, *arguendo*, that Plaintiff established a *prima facie* case of discrimination, Defendant has proffered legitimate, nondiscriminatory reasons for Plaintiff's termination.  "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."  *DeLuca v. Allied Domecq Quick Serv. Rests.*, No. 03 Cv. 5142 (JFB) (AKT), 2006 WL 1662611, at *9 (E.D.N.Y. June 13, 2006) (internal citation and quotation marks omitted).  Nevertheless, "an employer's explanation of its reasons must be clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext.  Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective [belief], no inference of discrimination can be drawn."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (internal citations and quotation marks omitted).

Here, Defendant contends that Plaintiff was terminated due to her inability to improve patient satisfaction scores in ORMC's Labor & Delivery Department, to cross-train nurses, and to train nurses on the Epic platform.  (Def.'s Mot. at 14.)  Plaintiff does not dispute that she was responsible for improving deficiencies in the Labor & Delivery Department.  (Pl.'s 56.1 ¶ 27.)  Though maternity wards typically have the highest patient satisfaction scores in hospitals, this was not the case with ORMC's Labor & Delivery Department.  (*Id*. ¶ 29.)  In fact, ORMC hired outside consultants and held town meetings to address these low patient satisfaction scores.  (*Id*. ¶ 30.)  During meetings with her supervisors, Plaintiff was informed that patient satisfaction scores in the Labor & Delivery Department were not rising to acceptable levels.  (Def.'s 56.1 ¶¶ 32–34.)  By September 2011, Labor & Delivery's patient satisfaction scores still had not risen to acceptable levels.  (*Id*. ¶ 34.)  Furthermore, Plaintiff did not meet the goal of cross-training all nurses by the time the hospital relocated to its new facilities in August 2011 (*id*. ¶¶ 44–45.), nor

16

did she train all the Labor & Delivery Department nurses on the Epic system.  (*Id.* ¶¶ 50–52.)

Plaintiff's poor job performance constitutes a legitimate, nondiscriminatory basis for Plaintiff's

termination.  *See Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012);

*McCullough v. Fin. Info. Servs. Agency*, 923 F. Supp. 54, 57 (S.D.N.Y. 1996); *Muhleisen v.*

*Wear Me Apparel LLC*, 644 F. Supp. 2d 375, 389 (S.D.N.Y. 2009).

### C.      Pretext

Because Defendant has met its burden of production by offering evidence that Plaintiff

was terminated due to her poor performance, the burden shifts back to Plaintiff to "show that the

proffered reason was merely a pretext for discrimination, which may be demonstrated either by

the presentation of additional evidence showing that the employer's proffered explanation is

unworthy of credence, or by reliance on the evidence comprising the prima facie case, without

more."  *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent*

*Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal citation and quotation marks omitted).

"[T]he plaintiff is not required to show that the employer's proffered reasons were false or

played no role in the employment decision, but only that they were not the only reasons and that

the prohibited factor was at least one of the 'motivating' factors."  *Back v. Hastings On Hudson*

*Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (internal citation and quotation marks

omitted).

Plaintiff bases her pretext argument almost entirely upon assertions contained in Ms.

Fogarty's Declaration.  (Pl.'s Opp. at 14–15.)  The vast majority of the statements in the Fogarty

Declaration, however, constitute inadmissible hearsay.  For example, Ms. Fogarty states in her

declaration that she was "informed that Ms. Tubo was criticized for not providing requisite

leadership," (Fogarty Decl. ¶ 13) and "from what [she was] told, Ms. Tubo was not provided

with any meaningful input regarding Ms. Schultz' expectations."  (*Id.* ¶ 20.)  The Court will not

consider inadmissible hearsay evidence on a summary judgment motion.  *See Underkofler v. Cmty. Health Care Plan, Inc.*, 225 F.3d 646 (2d Cir. 2000) (holding that the district court "properly rejected inadmissible hearsay in the form of an affidavit" containing hearsay statements).  Furthermore, while Plaintiff "is free to take issue with [Defendant's] assessment of [her] performance, [her] disagreement does not, under the circumstances," demonstrate that Defendant's assessment of her leadership skills was a pretext for racial discrimination.  *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 512 (S.D.N.Y. 2012) *aff'd*, 766 F.3d 163 (2d Cir. 2014).  Absent any evidence demonstrating or even providing an inference of pretext, the Court finds that Plaintiff's Title VII and NYSHRL claims fail as a matter of law.

## II.    State and Federal Retaliation Claims

Plaintiff's claim for retaliation in violation of Title VII or the NYSHRL is also analyzed under the *McDonnell-Douglas* burden-shifting framework.  To establish a *prima facie* case of retaliation, a plaintiff must show: "1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 844 (2d Cir. 2013) (internal citation and quotation marks omitted).  After establishing a *prima facie* case, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  *Id.* at 845 (internal citation omitted).  If the defendant meets this burden, the presumption falls away and the plaintiff must offer evidence demonstrating that the non-retaliatory reason is merely a pretext for retaliation. *Id.*  The Supreme Court also has required the plaintiff show that the "retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."  *Id.* (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)).  "However, 'but-for' causation does not require proof that retaliation was the only

cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 846. As with Plaintiff's Title VII and NYSHRL discrimination claims, Defendant concedes Plaintiff's termination constitutes an adverse employment action. Nevertheless, Defendant contends that Plaintiff has not presented evidence of a protected activity or Defendant's awareness of the activity and has not demonstrated a causal connection between her termination and any purported protected activity. (Def.'s Mot. at 7.)

### A.   *Defendant's Awareness of Protected Activity*

"A protected activity is action that 'protests or opposes statutorily prohibited discrimination.'" *Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). "While there are no magic words that must be used when complaining about a supervisor, in order to be protected activity the complainant must put the employer on notice that the complainant believes that discrimination is occurring." *Ramos v. City of New York*, No. 96-cv-3787 (DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997). Consequently, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Int'l Healthcare Exch., Inc. v Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (citing *Ramos*, 1997 WL 410493, at *3).

Here, Plaintiff alleges the following instances of protected activity: (1) Plaintiff's remarks at a January/February 2011 Leadership Conference (Pl.'s 56.1 ¶¶ 116–17); (2) Plaintiff's complaints to CEO Batulis that she was not receiving the same resources and staff support as other nursing managers (*id.* ¶ 118–19); and (3) Plaintiff's complaints to Medical Director, Dr. Oxley, and the administrator of Quality Assurance, Susan O'Boyle, regarding race discrimination (*id.* ¶ 121–23). (Pl.'s Opp. at 16.) With respect to both her remarks at the

Leadership Conference and her complaints to CEO Batulis, Plaintiff admits that she did not expressly raise the issue of race or racial discrimination in either instance. (Pl.'s 56.1 ¶ 117, 119.)  Instead, her comments and complaints concerned the lack of resources available to her as an administrator. (*Id.*)  Plaintiff attempts to argue that CEO Batulis should have known her complaint was grounded in race since she was the only non-Caucasian nursing manager. (Pl.'s Opp. at 16.)  Such an argument, however, is illogical, as Plaintiff essentially asks this Court to hold that any time a member of a protected class lodges a complaint to a supervisor, that supervisor should conclude the complaint is grounded in race discrimination.[5]  That standard has no basis in the law, and therefore neither her remarks at the Leadership Conference nor her complaints to CEO Batulis constitute protected activity.[6]

Unlike Plaintiff's comments at the Leadership Conference and her complaints to CEO Batulis, Plaintiff's complaints to Dr. Oxley and Ms. O'Boyle specifically concerned race discrimination. (Pl.'s 56.1 ¶ 121–22.)  At some point in 2011, Plaintiff advised Dr. Oxley and Ms. O'Boyle that she overheard the use of the word "negro" in the Operating Room. (*Id.* at 121.)  Plaintiff informed them that this was "offensive" and appeared to be reflective of "racial

---

[5] Plaintiff injects a similar argument in her 56.1 Statement. (Pl.'s 56.1 ¶ 117.)  With respect to her remarks at the Leadership Conference, Plaintiff states, "[a]lthough not expressly stated, the implication [of race discrimination] was apparent because Plaintiff was the only Afro-American, and the only manager not receiving necessary support, whereas the other managers, all Caucasian, were receiving support." (*Id.*)  This statement is an impermissible attempt to "couch argument and analysis as fact," and the Court will not consider this statement to be a material fact. *Forbes v. Lighthouse Int'l*, No. 11-cv-7065 (VB), 2013 WL 1811960, at *1, n. 1 (S.D.N.Y. May 1, 2013).

[6] Plaintiff cites *Galdieri-Ambrosini v. National Realty & Development Corporation* for the proposition that CEO Batulis, as head of ORMC, reasonably could be aware that her complaints were grounded in racial discrimination. (Pl.'s Opp. at 16) (citing 136 F.3d 276, 292 (2d Cir. 1998)).  A fuller reading of that case reveals that the Second Circuit held that where none of plaintiff's complaints to her supervisor "adverted to gender," plaintiff's employer could not have reasonably understood that those complaints were aimed at "conduct prohibited by Title VII," which is consistent with this Court's reasoning. 136 F.3d at 292.  Furthermore, *Pinner v. Budget Mortgage Bankers, Ltd.* is distinguishable from the instant action.  169 F. App'x 599 (2d Cir. 2006).  In *Pinner*, the court held that plaintiff's boss reasonably could have been aware that plaintiff's complaints related to conduct prohibited by Title VII because plaintiff's boss "effectively admitted" that plaintiff's complaint related to sexual harassment.  169 F. App'x at 600.  No such admission from Plaintiff's supervisor exists here.

bias" among ORMC employees.  (Tubo Decl. ¶ 110.)  Plaintiff argues that since Dr. Oxley and

Ms. O'Boyle were "high level officials," they reported—or should have reported—this

complaint to CEO Batulis.  (Pl.'s Opp. at 17.)

Though "general corporate knowledge" is sufficient "to satisfy the knowledge

requirement" of a retaliation claim, (*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116

(2d Cir. 2000)), Dr. Oxley and Ms. O'Boyle's knowledge is not imputed to ORMC.  The Second

Circuit has held that knowledge of protected activity on the part of a company's officers will be

imputed to the company in certain circumstances.  *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170,

1178 (2d Cir. 1996).  In *Reed*, the court held that "by complaining to an officer of the company .

. . and maintaining her complaint during the subsequent internal investigation of the matter, the

plaintiff was in effect communicating her concerns about [a co-worker's] comments to [the

company]."  *Id*.  Subsequently, courts have held that knowledge would be imputed to a corporate

defendant where (1) the corporate defendant was also a defendant in a previous discrimination

action brought by the plaintiff (the alleged protected activity) (*Gordon v. New York City Bd. of

Educ.*, 232 F.3d 111, 113 (2d Cir. 2000)) or (2) the plaintiff filed an internal EEO complaint

(*Alston v. New York City Transit Auth.*, 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998)).  Here,

however, there is no evidence in the record that either Dr. Oxley or Ms. O'Boyle was an

"officer" of ORMC.  While Dr. Oxley or Ms. O'Boyle may have administrative or managerial

responsibilities, Plaintiff has proffered no evidence to demonstrate that either Dr. Oxley or Ms.

O'Boyle was "an officer of the company" or an agent of the corporate Defendant, ORMC.  Nor

has the Court viewed any evidence presented by Defendant that would suggest Dr. Oxley and

Ms. O'Boyle were officers or agents of ORMC.  Additionally, the record is devoid of evidence

that would tend to demonstrate Dr. Oxley or Ms. O'Boyle reported this conversation to CEO

Batulis, let alone any other individual in an officer position at ORMC.  As there is no evidence to suggest that ORMC was aware of Plaintiff's complaint to Dr. Oxley and Ms. O'Boyle, Plaintiff has failed to establish her *prima facie* case for her retaliation claim.  Therefore, Plaintiff's retaliation claim under Title VII or the NYSHRL fails.  *See Smerdon v. Swedish-Am. Line*, 33 F.R.D. 314, 316 (S.D.N.Y. 1963) ("Where a plaintiff "set[s] forth no facts showing that there is a genuine issue for trial," summary judgment is "appropriate."); *King v. Crossland Sav. Bank*, 111 F.3d 251, 260 (2d Cir. 1997) (affirming District Court's grant of summary judgment where plaintiffs "presented no facts on summary judgment as to an alleged breach").

## III.    Breach of Contract/NYLL Claim

Plaintiff's final claim alleges breach of contract/NYLL for Defendant's alleged failure to pay Plaintiff earned vacation time.  Pursuant to Section 195(5) of NYLL, "[e]very employer shall notify his employees in writing or by publicly posting the employer's policy on sick leave, vacation, personal leave, holidays and hours."  N.Y. Lab. Law § 195.  "An employee's entitlement to receive payment for accrued, unused paid time off upon termination of employment is governed by the terms of the employer's publicized policy."  *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 120 (S.D.N.Y. 2009).  *See also Steinmetz v. Attentive Care, Inc.*, 39 Misc. 3d 148(A), 972 N.Y.S.2d 147 (App. Term 2013) ("The determination as to whether a former employee is entitled to be paid for accrued vacation time is governed by the contract between the parties.").  Additionally, the elements of a breach of contract claim under New York law are as follows: "(1) the existence of a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages resulting from the breach."  *Marks v. New York Univ.*, 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999) (internal citations omitted).

Upon being hired by Defendant, Plaintiff received a copy of ORMC's Vacation Policy, contained within its Employee Manual.  (Smith Aff., Ex. B at 53:16-55:5, Ex. G.)  The ORMC Vacation Policy provides that "[a]n employee terminated for reasons other than an economic layoff, retrenchment or a departmental reorganization or an employee who resigns without proper working notice <u>automatically forfeits</u> any accrued benefits."  (Connery Aff., Exs. 3, 4.) Plaintiff contends she did not automatically forfeit accrued vacation time because (1) CEO Batulis' objective to implement new leadership at ORMC is synonymous with a "departmental reorganization" and (2) the use of the term "forfeits" in the Vacation Policy connotes a prerequisite of wrongdoing on the part of the employee.  (Pl.'s Opp. at 18.)  Plaintiff fails to cite to any evidence in the record substantiating her claim that CEO Batulis "wanted new (white) leadership."  (*Id*.)  Rather, as stated above, the record establishes that Plaintiff was terminated due to poor job performance and leadership skills.  In any event, the termination of an administrator in the Labor & Delivery Department and a Nurse Director of the Emergency Room Services Department does not create enough of a corporate shake-up to constitute a departmental reorganization.

With respect to Plaintiff's second challenge to the vacation policy, Plaintiff attempts to read into the vacation policy a requirement that the employee must "have done something wrong" to not be entitled to accrued benefits.  (Pl.'s Opp. at 18.)  However, the language is clear that absent a termination under certain circumstances (economic layoff, retrenchment or a departmental reorganization), an employee is not entitled to accrued benefits—no further misconduct is required.  Pursuant to ORMC's Vacation Policy, which Plaintiff unequivocally acknowledges she received and reviewed, Plaintiff was not entitled to payment of accrued

vacation time upon her termination from ORMC.  Therefore, Plaintiff's claim for breach of contract/NYLL fails.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 23, enter judgment in favor of Defendant, and close this case.

Dated:    October _13_, 2015
          White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge